**Robert G. FISHER, et al., Appellants,**

v.

**DISTRICT OF COLUMBIA, et al., Appellees.**

**No. 84–896.**

District of Columbia Court of Appeals.
Argued June 5, 1985.
Decided Aug. 29, 1985.

Douglas B. Huron, Washington, D.C., for appellants.

Edward E. Schwab, Asst. Corp. Counsel, Washington, D.C., with whom Inez Smith Reid, Corp. Counsel, John H. Suda, Principal Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on brief, for appellees.

Before NEWMAN and BELSON, Associate Judges, and PAIR, Associate Judge, Retired.

PAIR, Associate Judge, Retired.

This appeal presents a challenge to the trial court's grant of summary judgment to the District of Columbia and William J. Veith in a suit against them founded on allegations of false arrest, negligence, and a violation of civil rights. Appellants Robert and Alice Fisher, the plaintiffs below, submit that summary disposition was inappropriate in light of the material factual disputes surrounding their claims. We conclude that with one exception, viz., the disposition of Alice Fisher's negligence claim against the District, their position is well taken. Accordingly, we affirm in part and reverse and remand for trial on the other counts.

I

April 25, 1982, was, to say the very least, a day of misfortune for Robert and Alice Fisher. Early in the preceding evening, the Fishers arrived at Maggie's Restaurant on Wisconsin Avenue, Northwest. They were accompanied by Alice Fisher's sisters, Mary Boyle and Eleanor Boyle Duckett, and were later joined by Alice's brother and his date. The group dined, drank beer, and socialized at Maggie's for a good portion of the night.

At about 11:00 p.m., the party sought a change of venue and decided upon a nearby restaurant named Windsor-McKay's. The group walked the short distance to Windsor-McKay's and remained there until it closed, 2:00 a.m., all the while drinking beer, dancing, and socializing. Daylight savings time had gone into effect on that date at 2:00 a.m., so the Fishers, Boyle, and Duckett actually left the restaurant at 3:00

a.m. (E.D.T.). Alice Fisher's brother and his date had left earlier in the evening.

After talking outside Windsor-McKay's for about a half an hour, the group went to their vehicles, a pickup truck and a Volkswagen, which were parked a few blocks away on 39th Street, Northwest. The events which followed are largely disputed.

## A. The Arrest of Robert Fisher

According to the Fishers, the four reached the Fishers' pickup truck and then Boyle escorted Duckett across 39th Street to Duckett's Volkswagen. As Boyle was returning (she was to travel home with the Fishers), another pickup truck came "barrelling" up 39th Street and then stopped, apparently to let her pass. She attempted to do so, but was immediately discouraged as those inside the truck taunted her with a game of "cat and mouse"—the truck would start, stop, and then start up again each time Boyle took a step into the street. As it turns out, the driver of the vehicle was appellee William Veith, a police cadet/trainee of the Metropolitan Police Department. However, Veith was not in training at the time; rather, he and two friends were just driving around the city and had been doing so since 8:00 p.m. the previous evening.

Unable to cross 39th Street, Boyle asked Veith and his friends to stop. At this point, Veith jumped out of his truck and then, in Boyle's words, began berating her. Hearing this, Robert Fisher went over to Veith and asked him to leave her alone. Veith yelled in response that he was a police officer and could have them all arrested. However, when asked to produce a badge, Veith showed Fisher only his police identification card. According to Fisher, he was unable to read the card or to recognize what it was because Veith was not holding it steadily.

During the confrontation, Fisher had his back to Veith's pickup truck and Veith was directly in front of him. At some point, Veith's two friends got out of the truck, presumably one from each side, approached Fisher and then surrounded him. In order to fend off one of them or, as Boyle put it, "[t]o keep the kid from stepping in on him," Fisher stuck out his arm and made contact with the person. As this occurred, Veith opened his jacket revealing his service revolver. This prompted Eleanor Duckett, who had witnessed the entire incident from a position near her car, to warn Fisher about the gun. She then accompanied Boyle to the Fishers' truck where Alice Fisher had been waiting.

At about this time, Officer Antoine Claiborn came upon the scene in his police cruiser. Veith rushed to Claiborn, informed him of Fisher's "assault" on his friend and then stated that he wanted to arrest him. Consequently, Claiborn informed Fisher that he was under arrest, placed handcuffs on him, and then transported him to the police station. Veith and his friends followed in their pickup truck.

Veith saw the events leading to Fisher's arrest differently. The Fishers, Boyle, and Duckett were standing in the middle of 39th Street when Veith came upon them in his pickup truck. He politely asked them to move so that he could go home but Robert Fisher stated, in no uncertain terms, that they would not get out of his way. Veith then got out of his truck, confronted the group, and again politely asked them to step aside. When they refused, Veith identified himself as a police officer. Fisher responded: "I don't care who the f___ you are. You ain't no one." Over the next few minutes, Veith made several requests that they leave and repeatedly identified himself as a police officer. Finally, Veith showed the group his badge, which Fisher then tried to swat away.

For Veith, the scene became progressively more threatening. Fisher and the others started yelling at him, using profanity, and then began to approach him. As they came "closer and closer," Veith sensed that Boyle and Duckett were surrounding him, and warned his friends in the truck, saying: "If anything happens, if anything looks like it's going to happen . . . come out and back

me up." However, the group continued its menacing behavior and, before long, Veith's friends got out of the truck to render assistance. As Veith describes it, Fisher then all of the sudden turned around and without justification punched one of his friends in the face. At Veith's admonition, the friend did not strike back. Several minutes later, after consulting Officer Claiborn, who had by then arrived on the scene, Veith arrested Fisher for assault.

### B. *The Assault on Alice Fisher*

Robert Fisher asked Officer Claiborn to drive slowly to the station so that his wife and her sisters could follow in the Fishers' truck. He agreed to do so, but after travelling only a short distance had to stop and wait for the women who themselves had stopped. After waiting briefly, he proceeded to the station without them.

According to the Fishers, the women had stopped the truck because they were distraught and confused. At some point, a second police cruiser, driven by Officer John Poland, pulled up behind them. Eleanor Duckett, who had been driving the pickup truck, got out and explained to Poland what had happened and asked that he take care of her sisters. She had decided to drive her Volkswagen to the station house so that both vehicles would be available in the event Robert Fisher was released that night.

After Duckett left, Boyle and Alice Fisher conferred with Officer Poland on the street. They related to him that neither was in a condition to drive: Boyle did not feel comfortable driving the Fishers' truck and Mrs. Fisher was too upset. Although Officer Poland agreed that neither should drive, because of police regulations he refused their request for a ride to the station. He did, however, consent to their parking the truck in a nearby lot.

Shortly after Boyle left to park the Fishers' truck, Officer Poland drove off, leaving Alice Fisher alone on the street. An unknown assailant immediately seized on the opportunity by grabbing Fisher and

pulling her into a "dark grassy area." There she was beaten, robbed, and raped. After the assailant left, Fisher ran to a nearby firehouse, arriving at 4:37 a.m. (E.D.T.), and reported the assault.

Appellees dispute several aspects of the Fishers' version of the circumstances surrounding this assault. First, they point to an argument between Mrs. Fisher and Boyle as the reason Duckett initially stopped the pickup truck and proceeded to the police station on her own. Appellees also suggest that after Duckett left, Officer Poland came upon the scene and talked briefly with Fisher and Boyle. He then left, however, and a few minutes later returned and saw Boyle alone. When Boyle told the officer that Fisher had disappeared, the two searched for her briefly and then went to the police station. There they learned that Fisher had gone to the fire station and reported that she had been raped.

### C. *Superior Court Proceedings*

On December 23, 1982, the Fishers filed a complaint in the Superior Court against the District of Columbia and William Veith setting forth several causes of action related to the incidents described above. The Fishers alleged, *inter alia*, that Robert Fisher had been falsely arrested and that Alice Fisher had suffered personal injury, loss of property, and extreme emotional distress and humiliation as a direct and proximate result of appellees' acts or omissions. More specifically, the complaint alleged that Veith had acted without the requisite probable cause to arrest Fisher, inasmuch as the critical events of that night were as follows:

> Robert Fisher, who had been observing the situation between Ms. Boyle and Mr. Veith, walked over to Veith and asked him to leave her alone. ... At this time, the driver and one other man who had been in the truck with Mr. Veith—neither of whom were police officers—got out and approached plaintiff Robert Fisher from either side in a threatening fashion.

Fisher put out his arms to stop them, and Veith stepped back, pulled his jacket aside in a threatening fashion and brandished a pistol.

And, with regard to the assault on Alice Fisher, the complaint stated that:

Plaintiff Alice Fisher would not have been assaulted if her husband, plaintiff Robert Fisher, had not been arrested. Nor would she have been assaulted if police officers had not left her and her sisters alone on a dark city street in the early morning hours.... The injuries suffered by Alice Fisher were within the risk created by defendants' actions.

The District of Columbia filed an answer on February 4, 1983. Several months later, on August 8, 1983, the Fishers submitted their "Second Amended Complaint" which included an allegation that appellees' tortious conduct on April 25, 1982, was in violation of 42 U.S.C. § 1983 (1982) ("Section 1983").[1] The amended complaint also contained the following allegation:

The policy and practice of defendant District of Columbia of issuing badges and service revolvers to police cadets such as defendant Veith before they have completed training, and of according them arrest authority at the same time, is a policy or practice which directly caused the violation of rights secured by 42 U.S.C. § 1983. Police cadets who have not completed the course of study at the Metropolitan Police Academy are not sufficiently experienced, trained or screened to be permitted to effect arrests, and defendant Veith was not sufficiently experienced, trained or screened to have

been permitted to effect arrests as of April 25, 1982.

On these bases, both Alice and Robert Fisher sought further damages from appellees.

On September 30, 1983, appellees moved to dismiss the Fishers' complaint and, alternatively, for summary judgment. Appellees maintained that there was no genuine issue as to any material fact and that they were entitled to judgment as a matter of law since (1) the arrest of Robert Fisher was supported by probable cause; (2) no special relationship existed between Alice Fisher and the District and therefore no legal duty was owed to her; and (3) the Fishers' claim of "negligent training" failed to state a cause of action under Section 1983. Appended to appellees' motion was a statement of material facts which they contended were not in dispute. *See* Super.Ct.Civ.R. 12–I(k). In support of their statement, appellees properly made reference to portions of the record. *See id.*

The Fishers filed a comprehensive opposition to appellees' motion on October 28, 1983, and attached thereto documentation in support of their claims. The opposition set forth in great detail the facts which the Fishers maintained were contested and uncontested. However, the Fishers' references to the record were sparse.

In an Opinion and Order dated June 8, 1984, the trial court granted the District of Columbia and William Veith summary judgment on all counts. Rejecting Robert Fisher's accusation of false arrest, the court observed:

In this case ... [Officer Veith] had ample grounds to believe that the plaintiff,

---

1. Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of

this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

As originally enacted, Section 1983 did not cover acts committed under color of District of Columbia law. Section 1983 was amended effective December 29, 1979, to include such acts. *See* Act of December 29, 1979, Pub.L.No. 96–170, 93 Stat. 1284 (codified at 42 U.S.C. § 1983 (1982)); *see also Henderson v. District of Columbia,* 493 A.2d 982, 994 n. 11 (D.C.1985).

Robert Fisher, had committed an assault in his presence. Plaintiff admits telling the officer that he wasn't going to arrest anyone. When the officer's companions approached after that, without any words or [sic] action on the part of the officer's companion, plaintiff pushed him. Plaintiff described his push as a "good shove." Such an act constitutes an assault within the meaning of ... [D.C. Code § 22–504 (1981)]. While plaintiff may have felt apprehensive in his own mind about the situation, it is the officer's reasonable good faith belief that an offense is being committed which determines whether probable cause exists. The circumstances as known to the officer, even as recounted by plaintiff Robert Fisher, would warrant a prudent man in believing that Mr. Fisher assaulted Officer Veith's companion. Thus, the arrest for the assault was reasonable and based on probable cause.

In reaching this conclusion, the court placed particular emphasis on an excerpt from Robert Fisher's deposition testimony:

Q. When these guys came, what did they say to you?

A. They just walked towards me. That is, it happened pretty fast. So the point—I was talking. When I turned, they were approaching me. I reached out and pushed the one closest to me. I didn't know what was going to happen. I just pushed him away.

Q. Did you inquire as to what he was going to do to you or why he was there, before you pushed him?

A. I don't know, I seem to think I said this doesn't concern you, or something, but I don't know.

Q. Do you remember striking any of these people, in any way?

A. No, not with the fist.

Q. With the hand?

A. No, I remember a distinct shove.

Q. Did they fall over?

A. I don't recall, I can give a pretty good shove, though.

Q. Did they come back to you?

A. No, everything happened pretty fast after that. I had turned back, and that is, you know, when all the other stuff [happened].

The trial court then noted that the Fishers did not controvert this account in their opposition with specific citation to any matter of record.

With respect to Alice Fisher's charges, the trial court found dispositive the absence of a special relationship between her and the police department as would give rise to a legal duty. The court concluded:

[Alice Fisher] ... and her sisters were citizens on the street entitled to police protection to the same extent as any other members of the general public. Certainly the police owe no legal duty to the public in general to drive individual citizens to special destinations nor to remain with them upon request. The police were not obligated by regulations or otherwise to drive plaintiff to the police station nor to await her determination of when, where and how she wanted to leave the scene of her husband's arrest. Plaintiff was not in any known position of peril except to the extent that all members of the public travelling on the streets of the city, particularly at night, are potential crime victims. To impose an obligation on the police department and the District to escort individuals about would be in derogation of the responsibility of the police to the general public.... Neither the request of plaintiff and her sisters for a ride and assistance nor the arrest of plaintiff's husband created the special type of relationship required to impose a special duty on the police to an individual citizen.

Finally, the trial court addressed the Fishers' claims under Section 1983.[2] While

**2.** The Fishers had also raised an ordinary negligence count on the facts which form the basis of their Section 1983 claims. The trial court ruled that the District of Columbia was immune from tort liability in the exercise of its discretionary acts, *viz.,* deciding when in the course of train-

recognizing that it was undisputed that the District followed a policy of issuing service revolvers to police cadets and according them arrest powers before they had completed training, the court determined that there had been no constitutional deprivation given its earlier conclusion that Fisher's arrest had been supported by probable cause. In the interest of completeness, the court nevertheless examined the Fishers' Section 1983 claims from the standpoint of negligent training or supervision of appellee Veith. It concluded, however, that the Fishers did not develop facts implicating "a complete failure to train or training so grossly negligent and reckless that police misconduct is substantially certain to result." [3]

## II

■ Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with ... affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Super.Ct.Civ.R. 56(c); *see Burt v. First American Bank*, 490 A.2d 182, 185 (D.C. 1985) (citations omitted). Given the extreme nature of this remedy, *Willis v. Cheek*, 387 A.2d 716, 719 (D.C.1978), a heavy burden is placed upon the movant to demonstrate the absence of disputed material facts and his entitlement to judgment as a matter of law. *Wyman v. Roesner*, 439 A.2d 516, 518 (D.C.1981) (citations omitted). But once the movant carries this burden, the opposition must raise genuine triable issues of fact. *Burt, supra,* 490 A.2d at 185; *Dillard v. Travelers Insurance Co.*, 298 A.2d 222, 224 (D.C.1972). However, "any doubt as to the existence of a factual dispute is to be resolved against the movant." *Turner v. American Motors*

*General Corp.*, 392 A.2d 1005, 1006 (D.C. 1978).

■ In reviewing a grant of summary judgment, this court must conduct an independent review of the record, including the pleadings, affidavits, and other materials on file. *Burt, supra,* 490 A.2d at 184–85. We have done so in the case *sub judice* and, viewing the evidence in the light most favorable to the Fishers, as we must, *see id.* at 185, conclude that summary disposition of their false arrest and Section 1983 claims was inappropriate.

### A. *False Arrest*

■ An action for false arrest will not lie if the conduct of the arresting officer was justified. *Scott v. District of Columbia*, 493 A.2d 319, 321 (D.C.1985) (citing *Dellums v. Powell*, 184 U.S.App.D.C. 275, 283, 566 F.2d 167, 175 (1977), *cert. denied*, 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978)). "An officer can justify his conduct upon a showing that he used only reasonable force to maintain the arrest and that he made the arrest in good faith and with probable cause." *Id.* (citing *Wade v. District of Columbia*, 310 A.2d 857, 862 (D.C.1973) (en banc)). If there is probable cause in the constitutional sense, then the arrest was lawful and perforce the false arrest claim fails. However, if the arrest was constitutionally unlawful, the arresting officer may still defend on the grounds that he had a good faith *and* reasonable belief that the arrest was lawful. *Henderson v. District of Columbia, supra* note 1, 493 A.2d at 994 (citing *Wade, supra,* 310 A.2d at 862–63); *Scott, supra,* 493 A.2d at 321 (quoting *same*). This determination is to be made by the court, as a matter of law, only where the facts are not in dispute and where the only inferences a juror could reasonably draw from the facts are that the officer had a good faith and reasonable

ing a police officer should be permitted to make an arrest. The Fishers have not challenged this ruling.

**3.** *See Hays v. Jefferson County, Kentucky,* 668 F.2d 869, 874 (6th Cir.), *cert. denied,* 459 U.S.

833, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982); *Owens v. Haas*, 601 F.2d 1242, 1247 (2d Cir.), *cert. denied*, 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979).

belief that his actions were lawful. *See generally Henderson, supra* note 1, 493 A.2d at 994 (citation omitted).

■ On this record, we cannot say that there was probable cause as a matter of law. A critical issue which develops in the pleadings, depositions, and other materials on file is whether Robert Fisher was justified in striking or shoving William Veith's friend. The Fishers alleged in their complaint, and in written argument, that Robert Fisher felt threatened by the man and stuck out his arm to fend him off. As Mary Boyle described it in deposition testimony, Veith's friend was "stepping in" on Fisher. She also believed that Fisher was merely assuming a defensive posture. This is in clear contradiction to the account of the incident offered by Veith, who testified in deposition that Fisher all of the sudden turned around, and without apparent reason, struck his friend in the face. Thus, there is a serious dispute as to whether Fisher in any way acted in defense.

As we read it, the deposition testimony of Fisher relied on by the trial court (and quoted *supra*) is inconclusive. It seems to pose more questions than it answers, particularly with respect to the issue of the good faith reasonable belief by Veith that the arrest was lawful. Given this, and the material factual dispute mentioned above, the trial court erred in concluding as a matter of law that Veith was entitled to a judgment on the false arrest claim. For this reason, summary judgment in favor of the District of Columbia on this count was also error. *See Wade v. District of Columbia, supra,* 310 A.2d at 863 (District of Columbia may be sued under the doctrine of *respondeat superior* for the intentional torts of its employees acting within the scope of their employment) (cited in *Scott v. District of Columbia, supra,* 493 A.2d at 322).[4]

### B. *Assault on Alice Fisher*

■ The trial court held that Alice Fisher could not recover for the negligent acts or omissions of the police department and the officers involved because, as a matter of law, she failed to establish that there was owed to her a special duty. It is, of course, well settled that a government and its agents are under no general duty to provide public services to any particular individual citizen. *Warren v. District of Columbia,* 444 A.2d 1, 4 (D.C.1981) (en banc) (citations omitted). Or, in the context of this case, "when a municipality or other governmental entity undertakes to furnish police services, it assumes a duty only to the public at large and not to individual members of the community." *Id.* (citations omitted).

The special duty doctrine recognizes an exception to this rule. "The general duty owed to the public may become a specific duty owed to an individual if the police and the individual are in a special relationship different than that existing between the police and citizens generally." *Id.* In *Morgan v. District of Columbia,* 468 A.2d 1306, 1315 (D.C.1983) (en banc), this court expounded on this principle, saying:

> Absent a special relationship ... the police may not be held liable for failure to protect a particular individual from harm caused by criminal conduct. A special relationship exists if the police employ an individual in aid of law enforcement, but does not exist merely because an individual requests, or a police officer promises to provide protection. Where the police by their actions affirmatively undertake to protect an individual under circumstances creating a special relationship or there is a statute or regulation which mandates protection of a particular class, and where the individual justifiably relies upon such undertaking of the

---

4. Parenthetically, we note that the parties are in agreement that Veith arrested Robert Fisher. Of course, if Claiborn had been the arresting officer there would have been no probable cause as a matter of law since he had not witnessed the altercation.

Incidentally, assault charges against Fisher were dismissed before prosecution.

police, or the statute or regulations, the special relationship is sufficient to support a finding of liability. (Footnote omitted.)

This case, then, turns on whether the police officers involved specifically undertook to protect Alice Fisher under circumstances creating a special relationship and, if so, whether she justifiably relied upon any such undertaking.

In framing a special relationship appellants point principally to the "heightened vulnerability" of Mrs. Fisher due to her husband's unlawful arrest and Officer Poland's "negligent response" to her plight. Citing *Morgan, supra,* 468 A.2d at 1312, appellants submit that the police "raise[d] significantly the quotient of risk" facing Fisher and that therefore it was error for the trial court to hold, as a matter of law, that no special duty was owed to her. While, at first glance, this position is alluring, it cannot be sustained.

█ In this jurisdiction, the special duty doctrine does not test whether *some* police conduct raised significantly the quotient of risk to a particular citizen. More precisely, in the appropriate case we look to see whether the police have acted "*on behalf of a particular citizen in such a way* as to raise significantly the quotient of risk over and above the risks assumed by every other member of the community...." *Id.* (emphasis added). Thus, before a special duty can be imposed it must first be shown that the police acted on behalf of the individual to whom, it is argued, the special duty was owed. It is for this reason that appellants' "heightened vulnerability" argument must fail. The arrest of Robert Fisher, whether lawful or unlawful, was not action undertaken by the police on his wife's behalf. Consequently, she cannot

successfully rest upon his purported unlawful arrest to establish the requisite special relationship.[5]

A more difficult question is whether the conduct of Officer Poland, who stopped to investigate the problems of Mrs. Fisher, Boyle, and Duckett, gave rise to a special duty. To be sure, the mere fact that he stopped and inquired of their situation is insufficient to create a special relationship. Moreover, no such relationship arose as a result of Mrs. Fisher's request for transportation to the station, for it is also settled that "a special relationship does not come into being simply because an individual requests assistance from the police." *Morgan, supra,* 468 A.2d at 1313 (citations omitted). The central question, then, becomes whether Officer Poland took affirmative action to protect or assist Alice Fisher under circumstances creating a special relationship and, if so, whether she justifiably relied upon his undertaking. *See id.* at 1315 (quoted *supra*).

The facts viewed favorably to appellants suggest that at some point after Duckett stopped the Fishers' truck, the three women got out and approached Poland, who by then had gotten out of his car. Duckett explained their predicament to Poland and then left to drive herself, in her car, to the station. Although Duckett told Poland that she was leaving her sisters in his care, Poland did not verbally agree to this undertaking. Shortly thereafter, Fisher and Boyle asked Poland to drive them to the station but he refused, giving them directions to the precinct instead. Upset that Poland would not assent to their request, Fisher then told Poland to leave.[6] After further discussion, Poland directed Boyle

---

5. Normally, a special relationship is not created by the act of a police officer who takes one person into custody and thereby places others in a more vulnerable position. This holds true even though an arrest is made without probable cause (as discussed in text *supra*) and for a good reason: to impose a special duty on the police on the basis of a determination by a court that an arrest was unlawful, long after the events, would leave the police at the scene unguided as to whether they owe a special duty to a companion of an arrestee.

6. We attach little significance to this statement. It is clear that Poland *did not* leave after being asked to do so.

to park the Fishers' truck in a nearby lot.[7] She did so, leaving Fisher and Poland standing together talking. When Boyle returned, both were gone. Fisher was later assaulted.

■ We cannot infer on this record that Officer Poland took affirmative action to protect or assist Fisher once Boyle left them to park the Fishers' truck. Appellants have posited no facts, in their pleadings or otherwise, which suggest that to be true. Absent such an allegation, this case presents no tenable basis for application of the special duty exception.

In sum, it appears that we would have to strain the special duty doctrine to find a "special relationship" in this case. As precarious as her situation was following her husband's arrest, under these circumstances police would ordinarily have no obligation to provide *individual* protection. As the trial court correctly observed, "[Alice] Fisher and her sisters were citizens on the street entitled to police protection to the same extent as any other members of the general public." Thus, even though Mrs. Fisher may have been stranded as a result of police conduct, or misconduct as the case may be, no special relationship can be found since there was no affirmative undertaking by any of the officers involved to protect or assist her and the circumstances were not such as would otherwise create a special relationship. Therefore, summary judgment on this claim was properly entered.

C. *Section 1983*

■ Section 1983 provides a civil remedy against those who under color of District of Columbia law deprive another of rights, privileges, or immunities secured by the Constitution. *See supra* note 1. The right of an individual to be free from an unconstitutional arrest is contemplated by the statute. *Duriso v. K-Mart No. 4195, Division of S.S. Kresge Company,* 559

F.2d 1274, 1277 (5th Cir.1977) (citations omitted); *see Pierson v. Ray,* 386 U.S. 547, 555–57, 87 S.Ct. 1213, 1218–19, 18 L.Ed.2d 288 (1967). But a police officer may avoid Section 1983 liability by demonstrating that an arrest was made in good faith and with a reasonable belief that it was lawful. *See generally Pierson, supra,* 386 U.S. at 557, 87 S.Ct. at 219.

■ The trial court granted summary judgment on the Fishers' Section 1983 claim against William Veith with little discussion. It is evident, however, that the court found dispositive on this issue its ruling that Robert Fisher's arrest was supported by probable cause as a matter of law. We disagreed with its conclusion, *supra,* and for this reason also find error in the disposition of this Section 1983 cause.

■ On the other hand, the Fishers' Section 1983 claim against the District of Columbia was predicated on the undisputed fact that the District follows a policy of issuing service revolvers to police cadets and according them arrest powers before they have completed training. Such an allegation is crucial to their cause against the District because, as the Supreme Court has made clear,

> [A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). In other words, "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691, 98 S.Ct. at 2036. It is only when a government policy

---

**7.** As we noted *supra,* neither Alice Fisher nor Boyle was in a condition to drive the Fishers' truck to the precinct.

or custom is the "moving force" of the constitutional violation that a Section 1983 action will lie. *Id.* at 694–95, 98 S.Ct. at 2037–38; *City of Oklahoma City v. Tuttle,* 37 Crim.L.Rep. (BNA) 3077, 3080 (June 5, 1985) (plurality) (citing *Polk County v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981)). Thus, the crucial question here is one of causation. *See id.* at 3082 (Brennan, J., concurring in part and in the judgment); *see also Powe v. City of Chicago,* 664 F.2d 639, 650 (7th Cir.1981).

In rejecting the Fishers' Section 1983 claim against the District, the trial court relied principally on its probable cause determination, which we found to be erroneous. As noted *supra,* the court then went on to discuss the cause in terms of negligent training or supervision of William Veith. Citing *Hays v. Jefferson County, Kentucky,* and *Owens v. Haas, supra* note 3, the court concluded that the Fishers had failed to establish facts implicating "a complete failure to train or training so grossly negligent and reckless that police misconduct is substantially certain to result."

The trial court misconstrued the Section 1983 claim against the District. The Fishers' amended complaint challenged a specific government policy, and alleged that the implementation of that policy caused the unconstitutional arrest of Robert Fisher. It being uncontroverted that the District's policy was in force, the question is not one of negligent training or supervision.[8] Rather, the sole issue in this respect is whether the government's policy worked to deprive Fisher of a constitutional right. Here, the basic facts underlying the claim are in dispute;[9] summary adjudication, therefore, was improper. *See generally Avery v. County of Burke,* 660 F.2d 111, 114–16 (4th Cir.1981).

*Reversed in Part and Remanded in Part for Proceedings Consistent with this Opinion.*

**8.** The Supreme Court's recent plurality opinion in *City of Oklahoma City v. Tuttle, supra,* looks to the "policy or custom" requirement for municipal liability under Section 1983 within the context of police training and supervision. Justice Rehnquist, writing for four members of the Court, had this to say:

> [T]he origins of *Monell's* "policy or custom" requirement should make clear that, at the least, that requirement was intended to prevent the imposition of municipal liability under circumstances where no wrong could be ascribed to municipal decisionmakers.
> ... [T]he word "policy" generally implies a course of action consciously chosen from among various alternatives; it is therefore difficult in one sense even to accept the submission that someone pursues a "policy" of "inadequate training," unless evidence be adduced which proves that the inadequacies resulted from a conscious choice—that is, proof that the policymakers deliberately chose a training program which would prove inadequate.

37 Crim.L.Rep. (BNA) at 3080–81 (footnote omitted). *See id.* at 3083 (Brennan, J., with whom Marshall, J. and Blackmun, J. joined, concurring) ("[T]he plaintiff must predicate his recovery on some particular action taken by the city, as opposed to an action taken unilaterally by a non-policymaking municipal employee ... [T]he plaintiff would carry his burden by proving the existence of a particular official municipal policy or established custom" (footnote omitted)). In the instant case, the Fishers point to a course of action consciously taken by the District, viz., vesting in police trainees the authority to carry service revolvers and effect arrests.

**9.** We note that the Fishers did not rest upon a bare assertion that the District's policy led to the wrongful arrest of Robert Fisher. Appended to their statement of material facts filed in opposition to appellees' motion for summary judgment was a publication entitled "Standards for Law Enforcement Agencies: The Standards Manual of the Law Enforcement Agency Accreditation Program." In their statement, the Fishers referred specifically to Section 33.4.1 of the Standards, which provides as follows:

> The agency requires all newly sworn officers to complete the recruit academy training program prior to any routine assignment in any capacity in which the officer is allowed to carry a firearm or is in a position to make an arrest, except as part of a formal field training program.